IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

KENNETH E. FAIRLEY, SR., *et al.*

VS.                                                 CIVIL ACTION NO. 2:13-CV-18-KS-MTP

HATTIESBURG, MISSISSIPPI, *et al.*

## MEMORANDUM OPINION

For the reasons provided below, the Court finds that Hattiesburg, Mississippi's current ward plan does not dilute the voting or political power of African-American citizens in violation of Section 2 of the Voting Rights Act.

## I. BACKGROUND

Hattiesburg, Mississippi, has a "mayor-council" form of municipal government, as provided in MISS. CODE ANN. §§ 21-8-1, *et seq.* The mayor is elected at-large and wields Hattiesburg's executive power. MISS. CODE ANN. § 21-8-15. A five-person city council wields the City's legislative power. MISS. CODE ANN. § 21-8-9. Each council member is elected from a ward, and each ward must "contain, as nearly as possible," a fifth of the City's population, "as shown by the most recent decennial census . . . ." MISS. CODE ANN § 21-8-7(4)(a)-(b). The City Council has the authority and obligation to redistrict the municipality when necessary, and its decision "may not be vetoed by the mayor." MISS. CODE ANN. § 21-8-7(c)(i).

Hattiesburg adopted the mayor-council form of government in 1985, and for the past thirty years, its City Council has had three white members and two African-American members. Wards 1, 3, and 4 – majority-white districts – have always elected

white candidates, while Wards 2 and 5 – majority-black districts – have always elected African-American candidates. According to the 2010 census data, African-Americans now comprise a majority of Hattiesburg's total population and a plurality of its voting-age population. Hattiesburg's most recent redistricting plan (the "Council Plan"), adopted on July 17, 2012, retains three majority-white wards and two majority-black wards, despite the City's slight African-American majority.

Plaintiffs are African-American citizens of Hattiesburg. They contend that the Council Plan violates § 2 of the Voting Rights Act by diluting the voting power of Hattiesburg's African-American citizens such that they have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice.[1] The Court held a bench trial on October 29-31, 2014. The parties submitted post-trial briefs [70, 75, 77], and the Court now renders a decision.

## II. STIPULATIONS AND JUDICIALLY-NOTICED FACTS

### A.   *The Parties' Stipulations*[2]

1.   Plaintiffs are African-American adult resident citizens and electors of Hattiesburg, Mississippi.

2.   Defendants are Hattiesburg, Mississippi; the Hattiesburg,

---

[1]Plaintiffs also asserted claims of intentional racial discrimination in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution, but they sought [71] leave to withdraw those claims during the post-trial briefing period. The Court dismissed [72] the constitutional claims without prejudice.

[2]The parties stipulated a variety of facts in the Pretrial Order [60].

Mississippi Democratic Executive Committee; and the Hattiesburg, Mississippi Election Commission. The City of Hattiesburg (the "City") is a municipal corporation situated in Forrest and Lamar counties in southern Mississippi.

3. The legislative power of the City is exercised by a municipal council pursuant to MISS. CODE ANN. § 21-8-9. The executive power of the municipality "shall be exercised by the mayor, and the mayor shall have the superintending control of all the officers and affairs of the municipality, and shall take care that the laws and ordinances are executed." MISS. CODE ANN. § 21-8-15 (2014). Department-head directors are appointed by the Mayor and confirmed by the City Council. MISS. CODE ANN. § 21-8-23 (2014).

4. From 1884 to 1911, Hattiesburg operated as a special charter municipality. In 1911, pursuant to Title 21, Chapter 5 of the Mississippi Code, Hattiesburg became a commission form of government and elected its commissioners city-wide or at-large. In 1985, as a result of litigation filed by African-Americans under Section 2 of the Voting Rights Act of 1965, Hattiesburg changed its form of government to the mayor-council form of government pursuant to MISS. CODE ANN. § 21-8-1, *et seq.* (Rev. 2007).

5. The City of Hattiesburg has a mayor-council form of government adopted under MISS. CODE ANN. § 21-8-1, *et seq.* (Rev. 2007). The City Council has five council members who are elected from wards and act as the legislative branch of government. MISS. CODE ANN. § 21-8-9 (Rev. 2007).

6. The Hattiesburg City Council is divided into five different wards. The geographical boundaries of the wards are established pursuant to MISS. CODE ANN. § 21-8-7. The City contains fourteen voting precincts.

7. The election commission has five members who are appointed by the Mayor and confirmed by the Hattiesburg City Council. Pursuant to state law, the election commission is charged with conducting all general and special municipal elections in Hattiesburg.

8. The present City Council has three white council members and two African-American council members.

9.  The City Council elected in 2001 consisted of three white council members and two African-American council members.

10. According to the 2010 census, the City has a total population of 45,989, with a single-race African-American population of 24,391 (53.04%) and an Any Part (AP) Black population of 24,797 (53.92%). The 2010 non-Hispanic white population is 18,615 (40.48%). Thus, the 2010 minority population – all persons who are not single-race non-Hispanic white – in the city is 27,374 (59.52%). The 2010 census also counted 1,996 Hispanics of any race (4.34%) in the City, 109 single-race Black Hispanics, and 156 AP Black Hispanics.

11. According to the 2010 census, the City has a total voting-age population of 36,293, of whom 17,402 (47.95%) are single-race African-American, with an AP Black voting-age population of 17,603 (48.50%). There are 16,689 (45.98%) voting-age non-Hispanic Whites in the City. Also, there are 1,749 (4.08%) voting-age Hispanics of any race, 79 voting-age single-race Black Hispanics, and 99 voting-age AP Black Hispanics.

12. On July 17, 2012, the City Council adopted a redistricting plan ("the Council Plan") based on 2010 census data. The motion to adopt the Council Plan was supported by the three white council members, Kim Bradley, Carter Carrol, and Dave Ware. The Council Plan was opposed by the two African-American council members, Deborah Delgado and Henry Naylor.

13. In the City's June 2, 2009, election, Johnny Dupree, an African-American, was re-elected city-wide without opposition.

14. In the City's 2009 election, four council members were elected unopposed, including Kim Bradley of Ward 1, Deborah Delgado of Ward 2, and Carter Carroll of Ward 4.

15. In Ward 5, Henry Naylor received 463 votes (62% of votes case) to defeat challenger Ray Coleman, Jr., who received 287 votes (38% of votes cast).

16. The City Council elected in 2009 consisted of three white council members and two African-American council members.

17. The African-American population of the City is predominately

located in City Wards 2 and 5.

18.    Under the Council Plan, Ward 2 has a total population of 8,901 residents. The African-American voting-age population is 4,898 residents, which comprises 74.0% of the Ward's voting-age population. Ward 2's white voting-age population is 1,238, which comprises 18.7% of the Ward's voting-age population.

19.    Under the Council Plan, Ward 5 has a total population of 9,524 residents. The African-American voting-age population is 4,870 residents, which comprises 76.9% of the Ward's voting-age population. Ward 5's white voting-age population is 1,208 residents, which comprises 19.1% of the Ward's voting-age population.

20.    Under the Council Plan, the white population of the City is predominately located in City Wards 1, 3, and 4.

21.    Under the Council Plan, Ward 1 has a total population of 9,506 residents. The white voting-age population is 4,368 residents, which comprises 52.7% of the Ward's voting-age population. For the same period, Ward 1 has an African-American voting-age population of 3,470 residents, which comprises 41.8% of the Ward's voting-age population.

22.    Under the Council Plan, Ward 3 has a total population of 9,069 residents. The white voting-age population is 5,584 residents, which comprises 73.6% of the Ward's voting-age population. For the same period, Ward 3 has an African-American voting-age population of 3,470 residents, which comprises 22.9% of the Ward's voting-age population.

23.    Under the Council Plan, Ward 4 has a total population of 8,991 residents. The white voting-age population is 4,800 residents, which comprises 64.3% of the Ward's voting-age population. For the same period, Ward 4 has an African-American voting-age population of 2,430 residents, which comprises 32.5% of the Ward's voting-age population.

24.    In the City's general election on June 4, 2013, Mayor Johnny Dupree was reelected city-wide to a fourth term as mayor. Dupree received 4,775 (49.47% of votes cast), while his white Republican challenger David Ware received 4,738 votes (49.09% of votes cast)

5

and the other three candidates combined received 138 votes (0.44%).

25.    In the City's general election on June 4, 2013, each of the incumbent council members was reelected. Deborah Delgado of Ward 2 and Carter Carroll of Ward 3 each ran unopposed. Kim Bradley of Ward 1, Mary Dryden of Ward 4, and Henry Naylor of Ward 5 each defeated a challenger.

26.    In Ward 1, Republican Kim Bradley received 570 votes (60.19% of votes cast) to defeat Democratic challenger J. C. Herrington, who received 165 votes (17.42% of votes cast) and independent Derrick Ware received 212 votes (22.38% of votes cast).

29.    In Ward 4, Mary Dryden received 1,603 votes (79.99% of votes cast) to defeat independent challenger Petra Arnold Wingo, who received 401 (20.01% of votes cast).

30.    In the City's Special Election of September 24, 2013, Mayor Johnny Dupree was re-elected as mayor. DuPree received 7,512 votes (53% of votes cast), while his white Republican challenger Dave Ware received 7,305 votes (47% of votes cast).

31.    Racial bloc voting refers to the differences in candidate choice between voters of different groups. Racially polarized voting exists where there is a consistent correlation between the race of the voter and his voting pattern – i.e. where African-American and white voters vote differently but as groups.

32.    Voter registration information in Hattiesburg is not kept by race.

33.    The African-American population of the City is predominately located in City Wards 2 and 5.

34.    The white population of the City is predominately located in City Wards 1, 3, and 4.

35.    The following African-American candidates have sought the following elective office in Hattiesburg, Mississippi, in the following years:

| Candidate | Office | Year(s) |
|---|---|---|
| Johnny Dupree | Mayor | 1997, 2001, 2005, 2009, 2013 |
| Lajuana S. Richardson | City Council Ward 1 | 2005 |
| Derrick Ware | City Council Ward 1 | 2013 |
| Deborah Delgado | City Council Ward 2 | 2001, 2005, 2009, 2013 |
| C. Jerome Brown | City Council Ward 4 | 2005 |
| Petra Arnold Wingo | City Council Ward 4 | 2013 |
| Therah Nathaniel | City Council Ward 4 | 2009 |
| Shrona Taylor | City Council Ward 1 | 2001 |
| Henry Naylor | City Council Ward 5 | 2001, 2005, 2009, 2013 |
| Kavji S. Beverly | City Council Ward 5 | 2013 |
| James Douglas Sullivan | City Council Ward 5 | 2013 |
| Ray Coleman Jr. | City Council Ward 5 | 2009 |
| Rose Harrell | City Council Ward 5 | 2009 |

36.    Johnny Dupree, an African-American, won contested city-wide mayoral general elections in Hattiesburg, Mississippi, in 2001, 2005, and 2013. Dupree was elected without opposition in 2009.

37.    The Hattiesburg public school system was desegregated by federal court order and remains under court order.

38.    Prior to 1965, Hattiesburg used poll taxes and literacy tests to the extent required by Mississippi law at that time.

39.    There is no candidate-slating process in Hattiesburg, Mississippi.

40.    From November 1, 1964, through 2013, Mississippi and all of its political subdivisions, including Hattiesburg, were covered by the preclearance requirement of the Voting Rights Act of 1965. In *Shelby County, Ala. v. Holder*, 133 S. Ct. 2612, 186 L. Ed. 2d 651 (2013), the Supreme Court of the United States declared Section

4 of the Voting Rights Act to be unconstitutional. As a result, Mississippi and its political subdivisions are no longer required to seek and obtain preclearance under Section 5.

41.   African-American voters in Hattiesburg are politically cohesive.

42.   Under the Council Plan, the city is divided into 14 city voting precincts.

43.   The University of Southern Mississippi ("USM") is located within the municipal corporate boundaries of Hattiesburg.

44.   Two of the five city council members are African-American and are elected from wards with a majority African-American voting-age population. The mayor is also African-American and was elected in city-wide voting in 2001, 2005, 2009, and 2013.

45.   The last regularly scheduled quadrennial general election of Hattiesburg's city council was held on June 4, 2013. A court-ordered special mayoral election was held on September 24, 2013. Another regularly scheduled quadrennial election of Hattiesburg's city council was held on June 7, 2005.

46.   Hattiesburg discontinued the use of a poll tax, literacy tests, citizenship test, and good moral test as a pre-requisite to voting or voter registration contemporaneously with the passage of the Voting Rights Act.

47.   Hattiesburg, Mississippi, is governed by a five-member city council which is elected from five single-member council districts. The qualified electors of each council district elect one member to the city council at regular quadrennial elections (2001, 2005, 2009, and 2013). The elected members of the Hattiesburg city council are responsible for the governance of the city and for drawing the city council district boundaries in accord with the one-person, one-vote principle of the equal protection clause of the Fourteenth Amendment to the United States Constitution.

48.   The existing plan – the Council Plan – is apportioned based on the published 2010 census.

49.   Ward 1 has a lower voter registration rate than Wards 2, 3, 4, and 5.

8

50.     In Hattiesburg's general elections in 2005, 2009, and 2013, Ward 1 had a lower voter turnout than the voter turnout rates in Wards 2, 3, 4, and 5.

51.     Legally significant racial bloc voting exists in white versus African-American city elections in 2001, 2005, 2009, and 2013 in Hattiesburg.

52.     Based on 2010 census data, a five-ward city council redistricting plan with three African-American voting-age population wards could be drawn for Hattiesburg.

53.     The African-American population in Hattiesburg is sufficiently large and geographically compact to constitute a majority of the voting-age population in three of the five wards.

54.     The students enrolled at USM are primarily situated in Ward 1, but some are included in all other Wards.

**B.     *Selected Judicially-Noticed Facts*[3]**

1.     The State of Mississippi and Hattiesburg, Mississippi, have an extensive past history of purposeful racial discrimination against African-American citizens, which affected their rights to register, vote, and participate in the democratic process.

2.     In the past, Mississippi and its subdivisions used a variety of mechanisms to disenfranchise the state's African-American population, including, but not limited to, literacy tests, poll taxes, durational residency requirements, all-white primaries, and "good moral character" requirements.

3.     Mississippi and its subdivisions have an extensive past history of providing racially segregated and inferior education for African-

---

[3]On April 25, 2014, Plaintiffs filed a Motion [36] for the Court to take judicial notice of certain facts. The Court granted the motion as unopposed [43]. On July 2, 2014, Defendants filed their own Motion [49] for the Court to take judicial notice of certain facts. Plaintiff did not oppose the motion [51], and the Court granted it [52]. Although the Court did not recite every judicially-noticed fact in this opinion, it considered them in making its decision, and they are incorporated herein by reference.

American school children.

4.   In *Fairley v. Hattiesburg*, No. 2:06-CV-167-KS-MTP, 2008 U.S.
     Dist. LEXIS 106354, at *23-*29 (S.D. Miss. Aug. 7, 2008), this
     Court examined whether, under the totality of the circumstances,
     Hattiesburg's African-American citizens had less opportunity than
     its white citizens to participate in the city's political process. The
     Court found that Hattiesburg had "endured a history of voting
     related discrimination by City officials up until the late 1960's,"
     but that "these discriminatory practices ceased long ago" and there
     was "no evidence . . . to prove official discrimination . . . continues
     to exist." *Id.* at 27. The Court also found that "African-American
     residents of the City generally have lower incomes and educational
     levels than other residents," but that there was "no indication that
     this lower standard of living hinders their ability to participate
     effectively in the political process." *Id.* 28. The Court found little
     evidence of "unresponsiveness to the minority community," and
     noted that "both the elected officials and the appointed executive
     officials in the City reflect the proportional balance of voting
     strength between the different communities." *Id.* In summary, the
     Court found that plaintiffs failed to show that African-Americans
     were deprived of an equal opportunity to participate in
     Hattiesburg's political process. *Id.* at *29.

5.   The United States Court of Appeals for the Fifth Circuit affirmed
     the Court's decision, holding that it correctly interpreted and
     applied the applicable law. *Fairley v. Hattiesburg*, 584 F.3d 660,
     673-74 (5th Cir. 2009).

### III. FINDINGS OF FACT[4]

1.   The City of Hattiesburg has a history of official racial
     discrimination, but all such practices ceased many years ago.

2.   There is a substantial socioeconomic disparity between
     Hattiesburg's African-American citizens and its white citizens in
     the areas of income, employment rate, educational attainment,
     home ownership, and vehicle availability.

---

[4]More detailed findings of fact are included throughout the Court's Section 2
analysis below. This section is only intended to provide the Court's broad factual
conclusions.

3.   Despite these socioeconomic disparities, Hattiesburg's African-American citizens have historically registered and voted in greater numbers than its white citizens, and in the most recent election year, turnout was essentially equal between black and white voters.

4.   The political participation of Hattiesburg's African-American citizens is not limited to voting. They actively participate in the political process in many ways.

5.   Although Hattiesburg's African-American citizens have lower incomes, educational levels, and standards of living than its white citizens, they participate in the political process at the same or higher levels.

6.   There is a high level of racial polarization among Hattiesburg's voters. Whites most often vote for whites, and blacks most often vote for blacks. However, voters are not polarized at the "mathematical maximum" level.

7.   Mississippi's majority-vote requirement has no effect on the ability of Hattiesburg's African-American citizens to elect candidates of their choice in the City's majority-white wards.

8.   There is no evidence of racial appeals in Hattiesburg's city elections.

9.   No African-American has ever been elected to the Hattiesburg City Council from Wards 1, 3, or 4 – the City's majority-white districts.

10.   Johnny Dupree, an African-American, has been elected mayor in four consecutive elections.

11.   In the mayor-council form of municipal government, the mayor wields a considerable amount of power.

12.   There is no racial disparity in Hattiesburg's provision of city services.

13.   City facilities in Hattiesburg's African-American neighborhoods are of equal quality to city facilities in its white neighborhoods. Likewise, city facilities in Hattiesburg's African-American neighborhoods receive the same budgeting and maintenance as city

facilities in white neighborhoods.

14.   In recent years, the City has made substantial infrastructure investments in the City's older neighborhoods, including its predominately African-American neighborhoods.

15.   A majority of Hattiesburg's employees are African-American, and at least half of its supervisory or "director" positions are held by African-Americans.

16.   The Hattiesburg City Council has never adopted a comprehensive minority contractor set-aside program, but it has adopted minority set-asides for specific contracts.

17.   The City Council struck $25,000 from the City's budget which had been allocated to "Twin Forks Rising," a development project in one of Hattiesburg's predominately African-American neighborhoods. However, the Council had already spent $160,000 of City money on Twin Forks Rising. In comparison, it only spent approximately $25,000 of City money on the "Midtown" development project in a predominately white area of Hattiesburg.

18.   From October 2011 through September 2014, the City Council took 205 votes. 187 of them (91.2%) were unanimous. Five votes (2.4%) were split 3-2, and only four (2.0%) of those were along racial lines.

19.   The City Council has used its budgeting power to eliminate funding for City positions, some of which were unfilled at the time of elimination.

20.   After the 2013 mayoral election, court challenge, and special election, two of the five City election commissioners – both white – resigned. The three remaining election commissioners – all African-American – did not resign. Citing alleged irregularities which led to the court challenge and special election, the City Council declined to ratify their reappointment by the mayor, but the City Council ratified the two new white election commissioners appointed. After the mayor appointed three new African-American election commissioners, the City Council ratified them, leaving the racial composition of the election commission as it was before the 2013 election.

21.   When the superintendent and school board of the Hattiesburg

12

Public School District requested an increase in their budget, the City Council voted along racial lines to not raise property taxes to meet the budget request. After the school board successfully sued the City Council over the budget request, the City Council declined – along racial lines – to ratify the mayor's reappointment of the school board members who disagreed with the Council.

22.   Over 90% of the students in the Hattiesburg Public School District are African-American.

23.   In the fall of 2013, the City Council voted 4-1 to discontinue its weekly "Citizens Forum," which was predominately attended by African-Americans. The City Council later declined to reinstate the forum by a 3-2 vote along racial lines.

24.   The City Council instructed its redistricting consultant to draw a new plan according to the traditional principles of redistricting.

25.   Race was not a motivating factor in the City Council's adoption of the current ward plan.

26.   The plan adopted by the City Council adhered more closely to traditional redistricting principles than the alternative plans.

27.   The CPAC plan favored by Councilwoman Delgado and the Plaintiffs would have split the University of Southern Mississippi and multiple historic neighborhood associations. It also would have displaced approximately 12,000 voters – a third of Hattiesburg's voting-age population – and sent them to different voting precincts.

28.   The number of districts in which African-Americans form an effective majority under Hattiesburg's current City Council ward plan is roughly proportional to African-Americans' share of Hattiesburg's voting-age and total population.

## IV. CONCLUSIONS OF LAW

Plaintiffs argue that the redistricting plan adopted by the City Council in July 2012 (the "Council Plan") violates Section 2 of the Voting Rights Act ("VRA") by impermissibly diluting the voting power of Hattiesburg's African-American citizens.

Section 2 of the VRA prohibits any "standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). A municipality violates Section 2 where, "based on the totality of the circumstances, it is shown that the political processes leading to . . . election in the . . . political subdivision are not equally open to participation by members of [a racial group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representative." *Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986).

To establish a Section 2 violation on a vote dilution theory, a plaintiff must first establish three threshold conditions: "(1) the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *LULAC v. Perry*, 548 U.S. 399, 425, 126 S. Ct. 2594, 165 L. Ed. 2d 609 (2006) (punctuation omitted); *see also Jones v. Bexar County, Texas*, 385 F.3d 853, 859-60 (5th Cir. 2004).

If the plaintiff establishes the three threshold requirements, the Court must "consider the totality of the circumstances to determine whether members of a racial group have less opportunity than do other members of the electorate." *LULAC*, 548

14

U.S. at 425-26. The following factors are relevant: (1) the history of voting-related discrimination in the political subdivision; (2) the extent to which voting in the elections of the political subdivision is racially polarized; (3) the extent to which the political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group; (4) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (5) the use of overt or subtle racial appeals in political campaigns; (6) the extent to which members of the minority group have been elected to public office in the jurisdiction; (7) evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group; (8) evidence that the policy underlying the political subdivision's use of the contested practice or structure is tenuous; and (9) whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area. *Id.* at 426; *see also Fairley*, 584 F.3d at 672-73.

The "most important" factors are "the extent to which minority group members have been elected to public office in the jurisdiction and the extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 51 n. 15. "If present, the other factors . . . are supportive of, but *not essential to*, a minority voter's claim." *Id.*

The list of factors "is neither comprehensive nor exclusive," and "there is no requirement that any particular number of factors be proven, or that a majority of

them point one way or the other." *Id.* at 45. "Rather, . . . the question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Id.* (punctuation omitted). "[P]roper assessment of vote dilution claims is peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms." *Jones*, 385 F.3d at 860. "[T]he ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts," *Johnson v. De Grandy*, 512 U.S. 997, 1011, 114 S. Ct. 2647, 129 L. Ed. 2d 775 (1994). "Although the district court is not required to recount every bit of evidence adduced at trial, it must discuss all 'substantive' evidence contrary to its opinion." *Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1221 (5th Cir, 1996).

Here, the parties stipulated that the three *Gingles* preconditions have been met, and the Court is only required to examine the totality of the circumstances.

> It will be only the unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances. In such cases, the district court must explain why it has concluded, under the particular facts of that case, that an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act.

*Teague v. Attala County*, 92 F.3d 283, 293 (5th Cir. 1996). However, the Court may not view the totality of the circumstances "less critically" because the *Gingles* preconditions have been met. *NAACP v. Fordice*, 252 F.3d 361, 373-74 (5th Cir. 2001).

**A.    *History of Discrimination and Its Effects***

16

"That Mississippi has a long and dubious history of discriminating against blacks is indisputable." *Teague*, 92 F.3d at 293-94. It is not necessary to provide a full lesson in Mississippi history. The Court took judicial notice of facts [36] regarding Mississippi's history of racial discrimination against African-Americans. The parties also stipulated that Hattiesburg once used disenfranchising mechanisms required by Mississippi law, such as poll taxes and literacy tests. Until 1985, Hattiesburg used a commission form of government and elected its commissioners at-large.[5] After this Court found that the form of Hattiesburg's city government violated Section 2, Hattiesburg switched to the mayor-council form of government provided by Miss. Code Ann. § 21-8-1, *et seq*. Finally, the Hattiesburg public school system was desegregated by a federal court order and remains under such order. In summary, Hattiesburg — like many municipalities in Mississippi and throughout the southeastern United States — has a long, well-established history of official discrimination against African-Americans for the purpose of limiting their participation in the democratic process.

However, as the Court noted in a previous opinion, "these discriminatory practices ceased long ago . . . ." *Fairley*, 2008 U.S. Dist. LEXIS 106354 at *28. The question for the Court is whether "the effects of past discrimination impede the ability of blacks in [Hattiesburg] to participate in the political process." *Teague*, 92 F.3d at 294. "[T]o support a favorable finding on these factors," Plaintiffs must demonstrate

---

[5]"It has been widely recognized that multimember districts and at-large voting schemes may operate to minimize or cancel out the voting strength of racial minorities in the voting population." *Westwego Citizens for Better Government v. Westwego*, 872 F.2d 1201, 1204 (5th Cir. 1989).

that "African-American citizens of [Hattiesburg] do not in fact participate to the same extent as other citizens." *Fordice*, 252 F.3d at 386. "[P]roof of socioeconomic disparities and a history of discrimination without more" is not sufficient to demonstrate that Hattiesburg's African-American citizens have less opportunity to participate in the political process than its other citizens. *Clark v. Calhoun County*, 88 F.3d 1393, 1399 (5th Cir. 1996).

According to the testimony and report of Plaintiff's expert, Dr. Allan Lichtman, there is a substantial disparity between the socioeconomic circumstances of Hattiesburg's black and white citizens. Dr. Lichtman's analysis provided the following undisputed facts:

1.  The median African-American household yearly income is $19,822, while the median white household yearly income is $36,901.

2.  African-Americans have a per capita income of $11,313, while whites have per capita income of $29,884.

3.  42.0% of African-American citizens live below the poverty line, compared to only 26.9% of white citizens.

4.  19.6% of African-Americans are unemployed, compared to 6.3% of whites.

5.  77.0% of African-Americans over the age of 25 have a high school degree, compared to 91.7% of whites in the same age group.

6.  14.4% of African-Americans over the age of 25 have a bachelor's degree or higher, compared to 50.4% of whites in the same age group.

7.  29.4% of African-Americans live in an owner-occupied home, compared to 46.5% of whites.

8.  African-Americans' median home value is $71,900, compared to a

18

white median home value of $141,300.

9.     12.4% of African-Americans have no vehicle available to them, while only 6.5% of whites have no vehicle available.

Accordingly, Dr. Lichtman concluded that there exists a substantial socioeconomic disparity between Hattiesburg's African-American citizens and its white citizens in the areas of income, employment rate, educational attainment, home ownership, and vehicle availability.

Despite these socioeconomic disparities, Hattiesburg's African-American citizens have historically registered and voted in greater numbers than its white citizens. Plaintiff's witness, Councilwoman Deborah Delgado admitted that a majority of Hattiesburg's registered voters are African-American, and that African-American turnout is higher than white turnout in most elections. According to an analysis by Plaintiff's expert, Dr. Allan Lichtman, 45% of registered African-American voters participated in the 2001 mayoral election, while only 29% of white registered voters participated; and 55% of registered African-American voters participated in the 2005 mayoral election, while only 26% of white registered voters participated. In the 2013 mayoral election, participation of black and white voters was essentially equal; whites had a slightly higher turnout in the 2013 general election, while African-Americans had a slightly higher turnout in the 2013 special election. Lichtman acknowledged, therefore, that African-Americans have traditionally enjoyed a substantially higher turnout than whites, but that turnout was essentially equal between black and white voters in the most recent election year.

19

The political participation of Hattiesburg's African-American citizens is not limited to voting. Plaintiffs introduced DVD's of public hearings held on May 17, May 29, June 12, and June 28 to discuss proposed redistricting plans, and of the July 3, 2012, City Council meeting in which the final vote occurred. The audience at the May 17 public hearing was mostly African-American, and most of the citizens who commented were African-American, including members of black community organizations and churches. One of the community organizations – CPAC – created its own proposed redistricting plan, which it presented at each public hearing. The audiences and speakers at the May 29, June 12, and June 28 public hearings were evenly split between African-Americans and whites, and the audience at the July 3 City Council meeting was also evenly split between African-Americans and whites. Councilwoman Delgado acknowledged in her comments at the July 3, 2012, City Council hearing that Hattiesburg has diverse political leadership. Additionally, Councilman Kim Bradley testified that 60-70% of the citizens who attended the City Council's weekly "Citizens Forum" were African-American.

Johnny Dupree, an African-American, has been elected mayor of Hattiesburg four consecutive times – in 2001, 2005, 2009, and 2013. The parties stipulated that Hattiesburg's African-American citizens are politically cohesive, and the record contains evidence (discussed in more detail below) that Hattiesburg experiences a high level of racial polarization in voting. Therefore, although African-American citizens did not comprise a majority of Hattiesburg's population until 2010, they were able to elect an African-American as mayor in four consecutive citywide elections. For the past

thirty years, the City Council has had two African-American members, elected from Wards 2 and 5. African-American candidates ran for City Council in Ward 1, a majority-white district, in 2001 (Shrona Taylor), 2005 (Lajuana S. Richardson), and 2013 (Derrick Ware). African-Americans ran for City Council in Ward 4, another majority-white district, in 2005 (C. Jerome Brown), 2009 (Therah Nathaniel), and 2013 (Petra Arnold Wingo).

Despite this evidence of African-Americans' robust participation in Hattiesburg's democratic process, Dr. Lichtman concluded in his report that socioeconomic circumstances "diminish[] the opportunity for minorities to participate equally with whites in the political process." At trial, he elaborated: "If you're dealing with populations that are low in income, low in education, it's harder to find candidates with the wherewithal and the qualifications to stand for public office. If you're dealing with a group that has high levels of poverty, low levels of income, it's difficult to fund campaigns." He asserted that these factors are "independent of turnout." He also testified that although "turnout . . . has been higher for African Americans, [and] today is about equal, [that] does not erase the fact that socioeconomic differences are a barrier to turnout. It just shows that other factors have been operating in the City of Hattiesburg as well."

In the Court's opinion, Dr. Lichtman's analysis of this issue is wholly disconnected from the local facts. He dismissed African-Americans' higher turnout, ascribing it to "other factors," but he failed to identify or analyze those factors. His opinion as to the political effect of socioeconomic disparity is largely abstract and

21

admittedly "based upon [his] experience as a political analyst, political historian, and expert in voting rights cases" – rather than upon local facts. This type of "armchair speculation" is not grounded in "an intensely local appraisal of [Hattiesburg's] social and political climate," and, therefore, can not establish that Hattiesburg's African-American citizens do not "participate equally in the political processes." *Clark*, 88 F.3d at 1399.

The question before the Court is not whether socioeconomic disparity limits political participation in the abstract, or even in most cases. Rather, the question is whether socioeconomic disparity has prevented Hattiesburg's African-American citizens from participating in the political process to the same extent as the City's other citizens. *Fordice*, 252 F.3d at 386. The evidence demonstrates that although Hattiesburg's African-American citizens have lower incomes, educational levels, and standards of living than its white citizens, they participate in the political process at the same or higher levels.

## B.   *Racial Polarization*

"[T]he extent to which voting in the elections of the . . . political subdivision is racially polarized is relevant to a vote dilution claim." *Gingles*, 478 U.S. at 55 (punctuation and citation omitted). "Because loss of political power through vote dilution is distinct from the mere inability to win a particular election, a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election." *Id.* at 57. In other words, "in a district where elections are shown usually to

be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting." *Id.* "[T]he success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances . . . may explain minority electoral success in a polarized contest." *Id.* Likewise, "exogenous elections – those not involving the particular office at issue – are less probative than elections involving the specific office that is the subject of the litigation." *Clark*, 88 F.3d at 1397. "[S]tatistical evidence is not conclusive," *id.*, but it can be used "to prove racially polarized voting patterns." *Rollins*, 89 F.3d at 1218.

The parties stipulated that legally significant racial bloc voting occurred in white versus African-American city elections in 2001, 2005, 2009, and 2013. Defendants also admitted that the *Gingles* preconditions were met, including the precondition that "the majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *LULAC*, 548 U.S. at 425.

The evidence presented at trial was consistent with these stipulations. Dr. Lichtman testified that voting in Hattiesburg's 2001 and 2005 city elections was "polarized at the mathematical maximum." In his Preliminary Report, analyzing the same data, he stated that "[b]lack voters invariably backed black candidates at the mathematical maximum," while "white voters united behind white candidates at close to the mathematical maximum." In his Supplemental Report, he examined the results of the 1997 mayoral election and found that "black voters overwhelmingly supported

the black candidate and white voters overwhelmingly supported the white candidates." Finally, in Dr. Lichtman's Second Supplemental Report, he examined the results of Hattiesburg's 2013 general and special mayoral elections. Once again, he found an "extreme pattern of racially polarized voting within the City of Hattiesburg." African-American voters were "invariably cohesive behind the African-American candidate," while white voters "invariably bloc vote against the African-American candidate." Dr. Lichtman summarized his findings by describing Hattiesburg's racial polarization as "the highest [he's] seen."

Defendants argue, though, that Hattiesburg's voting is not racially polarized to the mathematical maximum, and that African-American citizens in majority-white wards have a reasonable opportunity to elect candidates of their choice. Defendant's redistricting expert, Chris Watson, testified that an African-American candidate could win an election in one of Hattiesburg's majority-white districts. Watson looked at election results in three county voting precincts (Sigler Center, Camp School, and Kamper Park) which lie within the geographical footprint of Hattiesburg's Ward 4.[6] The three precincts have a total voting-age population of 6,420 persons, with African-Americans making up 34.8% (2,174) of the voting-age population. Ward 4, in comparison, has a voting-age population of 7,470, with African-Americans making up 32.5% (2,430) of the voting-age population. In the 2011 statewide gubernatorial

---

[6]A sliver of the Sigler Center precinct lies outside of Ward 4. Watson stated that it contains 907 potential voters, but that 613 of them reside in dormitories on the campus of the University of Southern Mississippi. He assumes, therefore, that they are unlikely to vote.

election, Johnny Dupree, an African-American, won 55.7% of the votes cast (1,038 out of 1,864) in the three precincts. In the 2012 federal election, President Obama received 56.5% of the votes cast (1,469 out of 2,602). Assuming that black turnout was essentially equal to white turnout, as posited by Dr. Lichtmann, Watson concludes that white voters must have "crossed over" and voted for Mayor Dupree and President Obama.

Watson also testified that an African-American candidate could win a City Council election in Ward 1 under the right circumstances. Ward 1 has a white voting-age population of 52.7%, and an African-American voting-age population of 41.8%. Ward 1 experiences substantially lower turnout than the other wards because it contains the University of Southern Mississippi, and a substantial portion of Ward 1's registered voters are USM students. Elections are held in the summer when most students have left town, and students generally tend to vote less often than other registered voters. In the 2013 election, 947 total votes were cast in Ward 1. The white incumbent (Kim Bradley) received 570 votes. One African-American challenger (Derrick Ware) received 212 votes, while a second African-American challenger (J. C. Herrington) received 165 votes. The parties agree that USM students are mostly white, and that Hattiesburg's African-Americans have historically turned out to vote in higher numbers than whites. Watson testified that under these circumstances, an African-American candidate could win a City Council election in Ward 1 with a modest amount of racial crossover.

Dr. Lichtmann strenuously disagreed with Watson's conclusion. He noted that

25

Watson's analysis rests on numerous assumptions and contingencies – all of which must fall into place before his prediction could come to fruition. Dr. Lichtmann also testified that Ward 1's gap in voting-age population was simply too much for African-Americans to overcome, particularly in light of the equal turnout numbers in the most recent city election.

The Court agrees that Watson's analysis on this issue is tenuous. There are simply too many contingencies to predict with any certainty that an African-American would win an election in Ward 1. However, Dr. Lichtmann discounts African-Americans' historic turnout advantage, relying heavily on the equal turnout in the 2013 city election. At this point, it remains to be seen whether the 2013 mayoral election – a controversial and highly contentious contest[7] – was an outlier. That being the case, Watson's Ward 1 analysis is not wholly lacking in probative value. In the right circumstances, an African-American candidate could win an election in Ward 1, although it is impossible to predict such an outcome with any certainty.

Watson also noted at trial that Dupree, an incumbent African-American mayor, received 706 votes from Ward 4 in the 2013 city election, while Petra Arnold Wingo, Ward 4's African-American candidate for City Council, only received 401 votes. Again, Watson argues that this demonstrates that Hattiesburg voters will cross racial lines

---

[7]Mayor Dupree won the 2013 general election by 37 votes. His challenger was Dave Ware, a white former member of the City Council. Ware challenged the results of the general election and cited, among other things, alleged procedural irregularities and improperly verified ballots. The jury was not able to reach a unanimous verdict, and the judge declared a mistrial and ordered the City to conduct a special election. Mayor Dupree won the special election.

under certain circumstances.

Dr. Lichtmann provided several criticisms of Watson's racial polarization analysis. First, he criticized Watson's use of data from "exogenous elections" and maintained that Watson failed to analyze the most probative data available. He admitted that Watson's data was not "entirely irrelevant," but he maintained that it was, "at best, marginally probative . . . ."

Dr. Lichtmann is correct that "exogenous elections – those not involving the particular office at issue – are less probative than elections involving the specific office that is the subject of the litigation." *Clark*, 88 F.3d at 1397. Watson's use of two exogenous elections does not render his analysis wholly irrelevant, though. In fact, Lichtmann heavily relied on the 2013 mayoral race – an exogenous election, albeit one conducted under the city redistricting plan at issue, rather than the county precincts used in statewide elections.

Watson tried to account for the differences between county districts and city wards by using county precincts that fell within the geographical footprint of a single city ward. But Watson's analysis required certain assumptions and analytical shortcuts, decreasing its probative value. Its most obvious defect is Watson's failure to acknowledge that the two statewide elections he analyzed could have been outliers because of other factors. Johnny Dupree, Hattiesburg's incumbent African-American mayor, was a candidate in the 2011 governor's race. Barack Obama, an incumbent African-American President, was up for reelection in 2012. Watson also failed to provide any hard numbers for voter turnout by race in each district, assuming that

27

whites and blacks turned out at approximately equal levels.

Lichtmann also testified that Watson did not use "standard methods in social science," such as "ecological regression analysis or any comparable methodology." But in the course of examining the evidence, it has become clear to the Court that any methodology is only as good as the underlying data. A sound methodology can be corrupted if a party chooses the data set with an eye toward a particular result or if a party fails to acknowledge the influence of unquantifiable factors. Watson only analyzed two statewide elections involving African-American incumbents. Lichtmann relied more heavily on the 2013 mayoral elections than past City Council elections, and he was wholly unwilling to acknowledge the probative value of any methodology but his own. The Court does not imply that either Lichtmann or Watson were dishonest, but voting rights litigation does not lend itself to detached, objective social science. Hired experts are constrained by the data provided to them by the parties, and any expert who admitted the inherent uncertainty in the process or acknowledged that the opposing expert has a point would not get any repeat business. As Mark Twain famously wrote: "Figures often beguile me, particularly when I have the arranging of them myself . . . . There are three kinds of lies: lies, damned lies and statistics." Mark Twain, Chapters from My Autobiography, 180 (Amazon Digital Services, Inc. 2011) (originally published 1906).

In summary, the parties agree and the evidence demonstrates that there is a high level of racial polarization among Hattiesburg's voters. Whites most often vote for whites, and blacks most often vote for blacks. However, the Court does not accept

28

Plaintiffs' argument that voters are polarized at the "mathematical maximum" level. Although Dr. Lichtmann's analysis has more probative value than Mr. Watson's, he failed to acknowledge the disparity between votes cast for Petra Arnold Wingo and Mayor Dupree in Ward 4 during the 2013 city election – strong evidence that a subset of Hattiesburg voters can and do cross racial lines under certain circumstances. On the other hand, Defendants overestimate the strength of this evidence and of Mr. Watson's testimony. On the whole, the evidence supports what the parties have agreed: that there is a high level of racial polarization among Hattiesburg's voters. The Court need not extend its conclusion any further than that.

## C.   *Practices & Procedures*

Plaintiffs note that Mississippi's majority-vote requirement for party primaries applies in Hattiesburg's city elections. *See* MISS. CODE ANN. § 23-15-305. "[U]nder certain circumstances, the majority vote requirement can operate to the detriment of minority voters and negate their political strength." *Clark*, 88 F.3d at 1398. However, Plaintiffs presented no evidence that the majority-vote requirement has had any effect on African-Americans' ability to elect candidates of their choice in Hattiesburg's City Council elections, or that African-American candidates had been defeated in primary runoffs. Rather, the focus of the evidence was on African-American candidates' ability to win a general election in majority-white districts.

Plaintiffs admitted in briefing that other electoral practices and procedures., such as the size of the election districts, place requirements, and candidate slating processes, were not an issue in this case.

### D.   Racial Appeals

Plaintiffs admitted in briefing that there is no evidence of racial appeals in Hattiesburg's City Council political campaigns.

### E.   Minorities Elected

The Court takes an "analytical yet pragmatic approach to determining how the success of African-American candidates affects the vote dilution analysis." *Fordice*, 252 F.3d at 369. The "success of African-American candidates at the polls" does not "necessarily foreclose[] the possibility of dilution of the African-American vote." *Id.* It is, however, "presumptively inconsistent with such a claim." *Id.* at 371. Likewise, "[l]ack of electoral success is evidence of vote dilution," but the Court "must also examine other evidence in the totality of the circumstances, including the extent of the opportunities minority voters enjoy to participate in the political processes." *De Grandy*, 512 U.S. at 1011-12. "[E]xogenous elections are less probative than elections for the particular office at issue," but "the exogenous character of . . . elections does not render them nonprobative . . . ." *Fordice*, 252 F.3d at 370.

The most probative evidence here is the election results in Wards 1, 3, and 4 – Hattiesburg's majority-white districts. It is undisputed that no African-American candidate has ever been elected to the Hattiesburg City Council from those wards.

For the past thirty years, though, the City Council members from Wards 2 and 5 have been African-American. Likewise, Johnny Dupree won Hattiesburg's mayoral

elections in 2001, 2005, 2009,[8] and 2013. Mayor Dupree enjoyed citywide electoral success at a time when African-Americans did not comprise a majority of the city's population. He admitted at trial that he would not have initially been elected without cross-racial support.

The Court also notes that, as mayor, Dupree wields considerable power. He enjoys "superintending control of all the offices and affairs of the municipality . . . ." MISS. CODE ANN. § 21-8-15. He "supervise[s] all of the departments of the municipal government," and the City Council is not permitted to "give orders to any employee or subordinate of the municipality" beyond its own staff. MISS. CODE ANN. § 21-8-17(1). No ordinance passed by the City Council can take effect without the mayor's approval. MISS. CODE ANN. § 21-8-17(2). Although the City Council can override his veto with a 2/3 vote, that would require one of the two African-American Council members to vote with the white majority and provide four out of five votes. Finally, the Mayor may "attend meetings of the council and take part in [its] discussions," and if there is a "tie on the question of filling a vacancy in the council, . . . he may cast the deciding vote." MISS. CODE ANN. § 21-8-17(3).

In summary, no African-American has ever been elected to the City Council from Wards 1, 3, or 4, which tilts this factor in Plaintiffs' favor. However, that fact is mitigated by Mayor Dupree's success in citywide elections and the considerable power he wields as mayor.

---

[8]Mayor Dupree ran unopposed in 2009.

**F.      *Responsiveness to Minority Needs***

This factor "concerns legislative responsiveness to the particularized needs of the minority group." *David v. Garrison*, 553 F.2d 923, 929 (5th Cir. 1977). There are two facets of the inquiry: 1) "the provisions of municipal services to neighborhoods populated by minority group members," and 2) "the distribution of municipal jobs and appointments to various boards and commissions." *Id.* Responsiveness plays a "diminished role" in the totality-of-the-circumstances analysis. *Jones*, 727 F.2d at 382; *see also Westwego*, 946 F.2d at 1122 (describing responsiveness as "of limited relevance"). Therefore, it "is not an essential part of plaintiff's case." *Clark*, 88 F.3d at 1400.

**1.      *Redistricting Plan***

Plaintiffs argue that the City Council's failure to adopt a redistricting plan with three majority-black districts is proof of their lack of responsiveness to the needs of Hattiesburg's African-American citizens.[9] However, Plaintiffs cited no authority suggesting that the electoral mechanism or procedure at issue in a vote dilution case should be the focus of the responsiveness analysis. Rather, the focus appears to be on the basics of city governance, such as hiring, provision of services, and funding of projects/initiatives. *See, e.g. Fordice*, 252 F.3d at 372; *Clark*, 88 F.3d at 1400; *McCarty*

---

[9]The Court notes that this is the *only* item addressed in Plaintiffs' briefing on the responsiveness issue. Plaintiffs did not address the other facts discussed below. Although the Court is under no obligation to search the record for evidence to prove Plaintiffs' case, it has endeavored to address every factual issue raised at trial, regardless of Plaintiffs' briefing.

32

*v. Henson*, 749 F.2d 1134, 1136-37 (5th Cir. 1984); *Jones*, 727 F.2d at 381-82; *David*, 553 F.2d at 929.

> 2.      *City Services*

The City presented a report from its expert, Chris Watson, who "examined city services in search of a disparity in the delivery of services to the citizens of Hattiesburg . . . ." He interviewed city department heads and examined the city's infrastructure and facilities. In short, he found no racial disparity in the provision or funding of city services. Department heads did not report any disparity in budgeting practices, and city facilities in black and white neighborhoods are of equal quality and receive equal maintenance.

At trial, Councilman Kim Bradley described a "Comprehensive Sewer and Water Enhancement Program" that began around 2010. In the first phase of the program, $5,000,000 was allocated to newly annexed portions of west Hattiesburg along Highway 98, while $7,500,000 was allocated to the older parts of the City in Wards 2, 4, and 5 – which includes the City's predominately African-American neighborhoods. Bradley testified that the City had allocated $22,000,000 for the second phase of the program, and that "most of the money" was for infrastructure projects in Wards 2, 4, and 5. He specifically noted that approximately $400,000 had been spent on repaving Seventh Street from North Main to where it terminated on Fourth Street – a project that touched three different wards, including African-American neighborhoods.

> 3.      *Hiring and Contracting*

In his March 2014 report, Defendants' expert, Chris Watson, stated that the City

employs 686 people, that 57.7% of City employees were African-American, and that 58.8% of the City's management-level employees are African-American. At trial, he testified that Hattiesburg employed 676 people, and that 426 of the City's employees were African-American (63%), while only 244 were white (36.1%). He testified that 410 of the 645 non-director positions were occupied by African-Americans (63.6%), while only 229 were occupied by whites (35.5%). Finally, he testified that African-Americans held 16 of 31 director positions (51.6%), while whites held 15 director positions (48.4%).[10] Mayor Dupree's testimony was consistent with Watson's findings. Dupree testified that the City's salaried positions were split evenly between African-Americans and whites, while African-Americans held a higher percentage of the City's hourly employees.

Councilwoman Deborah Delgado testified that she did not believe the Council had hired enough minority contractors in the past, but she admitted that she had never proposed for the City to adopt a minority set-aside program. Councilman Kim Bradley testified that although the City Council had never adopted a comprehensive minority set-aside plan, it had adopted minority set-asides for specific contracts. He said that the City Council had difficulty finding minority contractors in the Pine Belt, and that his preference was to keep the City's spending local, rather than having to look out of state.

4.    *Twin Forks Rising / Midtown Project*

---

[10]Watson included Mayor Dupree – an elected official – in his list of "director positions."

The parties presented evidence concerning two City development projects. First, Councilwoman Delgado described "Twin Forks Rising" as an "urban overlay district" for the revitalization of Ward 2, a majority-black district. According to Delgado, most of Ward 2's residents live below the poverty line, and the Ward has few development opportunities because much of it lies in a flood zone between two rivers. She said that "[i]t was difficult through the years to get the council to allow funding for the study that was conducted," but that the Mayor set aside $160,000 of Community Development Block Grant funds – federal funds allocated to the City – to pay for the study. Both Delgado and Dupree testified that another $25,000 of city funds had been allocated to the Twin Forks project, but that the City Council voted to eliminate it from the budget.

Councilwoman Delgado compared the Twin Forks project to the "Midtown Project," a development project in Ward 3, a majority-white district. She admitted that the City had only spent $25,000 of its funds on the Midtown project, and that most of the funding had come from sources outside the City's coffers. Mayor Dupree testified that a local coalition including private investors, Hattiesburg Clinic, and Forrest General Hospital donated $150,000 for Midtown, and another $150,000 came from a matching grant. Dupree admitted that the City only spent "some basic planning dollars" on Midtown, but he questioned whether the City had sought "private buy-in" for Twin Forks to the degree it had for Midtown.

5.    *Council Voting Patterns*

Councilwoman Delgado testified that the three white City Council members

35

generally form agreements among themselves before Council meetings, and that she only finds out what they will decide in the meetings. She testified that they never agree with her on issues that she believes are in the best interest of her community, and that at least 90% of the City Council's votes are 3-2 along racial lines. However, at the July 3, 2012, City Council meeting, Ms. Delgado prefaced her comments on the Council Plan by asserting that she and her white colleagues agreed on most issues that they confronted in the course of city governance.

At trial, Councilman Kim Bradley strongly disagreed with Delgado's description of the Council's voting patterns. He testified that 3-2 votes are a "very small percentage" of the Council's decisions, and that 97-98% of the Council's decisions are unanimous.

The City Council's minutes from October 2011 through September 2014 demonstrate that Bradley's recollection is more accurate than Delgado's. According to the minutes, the City Council took 205 votes between October 2011 and September 2014, and 187 of them (91.2%) were unanimous. Five votes (2.4%) were split 3-2, and only four (2.0%) of those were along racial lines.[11] Therefore, this sample of City Council votes – from the same period of time as the redistricting process and the 2013 mayoral election – demonstrates that the white and black City Council members agree on more than 90% of the issues they address.

---

[11]By the Court's count, 127 votes were 5-0; fifty votes were 4-0; ten votes were 3-0; seven votes were 4-1; two votes were 3-1; one vote was 2-1; three votes were 2-2; five votes were 3-2; and four votes were 3-2 along racial lines.

6. *The Council's Relationship with the Mayor*

Plaintiffs presented a variety of testimony indicating that the white members of the City Council have disagreed with Mayor Dupree on several issues in recent years. Dupree himself described his relationship with the City Council as "very contentious, at best." First, he testified that the Council reduced the City's budget to eliminate some positions. He noted that the City had approximately 850 employees when he first became mayor, but that the number had been cut to less than 700.

According to Councilman Kim Bradley, a number of City positions had been unfilled, but they remained in their department's budget to keep the cash available for the next budget year. Bradley testified that Mayor Dupree requested a tax increase to fund a paving project. Rather than raise taxes, Bradley believed it more prudent to eliminate the unfilled positions and use the leftover funds to pay for the paving project. He said that the City Council assured Mayor Dupree and affected department heads that they could request refunding of the eliminated positions on a case-by-case basis.

The parties also presented testimony concerning Mayor Dupree's appointments to the Hattiesburg election commission after the contentious 2013 mayoral election. Before the 2013 election, the racial composition of the commission was three African-Americans and two whites. After the election, the two white commissioners resigned in the wake of a court challenge and alleged procedural irregularities in the election. Mayor Dupree tried to reappoint the three African-Americans who had served prior to the disputed election, plus two new white commissioners. The City Council declined to ratify the reappointments of the three African-American commissioners. Councilman

37

Kim Bradley testified that he was concerned by the City's "very weak municipal voting system." He believed the election commissioners' failure to properly supervise and train their workers caused the election challenge and special election. The mayor eventually appointed three other African-American candidates, and the City Council approved them. The current makeup of the election commission is the same as it was before the 2013 election: three African-Americans and two whites.

Finally, Councilwoman Delgado testified that the white members of the City Council had asked the superintendent and school board for the Hattiesburg Public School District to not increase their budget request. After the school board refused, the City Council voted along racial lines to not increase property taxes to meet the school board's funding request. The school board sued the City and won. The white City Council members later declined to ratify the Mayor's reappointment of the school members who had disagreed with the Council and requested the property tax increase.

### 7.  *Citizens Forum*

Since at least 2005, Hattiesburg's City Council held a weekly "Citizens Forum," in which citizens were permitted to speak to the City Council about any topic they desired. Most of the citizens who attended the weekly forum were African-American. The City Council suspended the practice in the fall of 2013 by a 4-1 vote. Councilwoman Delgado was the lone dissenter. In the fall of 2014, the City Council declined to reinstate the Citizens Forum by a vote of 3-2 along racial lines.

### 8.  *Summary*

In summary, there is no racial disparity in the provision or funding of city

services or facilities. In fact, the evidence shows that the City has committed a substantial amount of resources to infrastructure improvements in its African-American neighborhoods. A majority of Hattiesburg's employees are African-American, and at least half of its supervisory or "director" positions are held by African-Americans. Although Hattiesburg has never adopted a comprehensive minority set-aside policy, it has provided for minority set-asides in specific contracts. On most issues, the white members of the City Council agree with the African-American members. Over the course of the four years preceding this trial, the City Council split 3-2 along racial lines in only 2.0% of its votes. Finally, the City spent considerably more of its own money on Councilwoman Delgado's Twin Forks Rising project than it did on a comparable project in a majority-white district.

The evidence overwhelmingly demonstrates that the City Council is responsive to the needs of the African-American community. The Court declines to interpret every disagreement with Mayor Dupree or Councilwoman Delgado as an example of unresponsiveness to the needs of the African-American community. Councilman Bradley provided reasonable explanations for the Council's actions that were not related to race, and whether one agrees with him or not, his political positions can be argued in good faith – just as Mayor Dupree's and Councilwoman Delgado's can.

## G.    *Tenuousness*

Plaintiffs argue that there is no state policy or interest requiring municipalities to create a ward plan with a majority of white districts when African-Americans comprise a majority of the total population. In response, Defendants argue that the

Council Plan furthers a number of legitimate state interests. "[T]he weight, as well as tenuousness, of the state's interest is a legitimate factor in analyzing the totality of circumstances." *Clark*, 88 F.3d at 1401. "[P]roof of a merely non-tenous state interest discounts one . . . factor, but cannot defeat liability." *Id.*

Councilman Carroll and Councilman Bradley both testified that, based on the advice of counsel, their primary goal was to correct the deviation in the wards' populations and bring the City's districts in line with the one person/one vote requirement with as little change to the existing district lines as possible. The Council's expert, Chris Watson, testified at trial and stated in his public presentations that he drew the current plan with the specific goals of correcting the population deviations to bring the wards in line with the one person/one vote principle, causing as little change to the existing ward lines as possible, causing as few voters to change voting precincts as possible, maintaining all of the communities of interest, and respecting traditional geographical boundaries.

These are all legitimate state interests. Courts and legislative bodies must consider traditional redistricting concerns such as communities of interest, traditional geographical boundaries, the one person-one vote principle, the protection of political incumbents, compactness, and the maintenance of voting precincts. *See Fairley*, 584 F.3d at 670; *Chen v. City of Houston*, 206 F.3d 502, 512 (5th Cir. 2000). Indeed, the Fifth Circuit previously ruled that "[a]ny plan that split USM into multiple wards . . . would be highly suspect on its face." *Id.* Here, the plan promoted by Councilwoman Delgado and Plaintiffs during the public hearings – the CPAC plan – would have split

40

USM and multiple historic neighborhood associations. It is also undisputed that the CPAC plan would have displaced approximately 12,000 voters – a third of the voting-age population of Hattiesburg – and sent them to new voting precincts.

In summary, Defendants articulated and presented evidence of legitimate, non-tenuous state interests furthered by the Council Plan. Councilman Carroll, Councilman Bradley, and the City Council's redistricting consultant all testified that race played no factor in their decision-making. Plaintiffs presented no evidence to contradict this testimony beyond unsupported speculation. Accordingly, Plaintiffs failed to demonstrate that the City Council's interest in the current plan is tenuous.

## H.   *Rough Proportionality*

Finally, Plaintiffs' chief argument is that the Council Plan does not accurately reflect Hattiesburg's population. Plaintiffs contend that three of the five City Council wards must have a majority African-American population because African-Americans are a majority of Hattiesburg's total population. In response, Defendants argue that the Council Plan is roughly proportional to the City's racial composition.

"Proportionality," as the term is used here, "links the number of majority-minority voting districts to minority members' share of the relevant population." *De Grandy*, 512 U.S. at 1014 n. 11. Congress specifically provided that "nothing in [§ 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 43 (discussing legislative history of § 2). The question is whether minority groups enjoy electoral opportunity in rough proportion to their share of the population, rather than

41

whether they enjoy electoral success in proportion to their share of the population. *De Grandy*, 512 U.S. at 1013-14. Therefore, a "lack of proportional representation alone does not establish a violation." *Gingles*, 478 U.S. at 46.

According to the 2010 census, Hattiesburg has a total population of 45,989. The City's African-American population is 24,391 (53.04%), and its non-Hispanic white population is 18,615 (40.48%). Hattiesburg has a voting-age population of 36,293. The City's African-American voting-age population is 17,402 (47.95%), and its non-Hispanic white voting-age population is 16,689 (45.98%). Therefore, African-Americans are a majority of the total population, and a slight plurality of the voting-age population.

In the Court's opinion, the Council Plan provides African-Americans with electoral opportunity that is roughly proportional to their share of the City's population. Strict proportionality is impossible. Regardless of the result, one side of this dispute will get forty percent of the voting power (2 out of 5 Council positions), while the other will get sixty percent (3 out of 5). With the current population numbers, there is no way to apportion five seats and achieve strict proportionality. There will necessarily be an imbalance in one direction or the other. It may be the case that either scenario – the Council Plan or Plaintiffs' CPAC plan – would provide African-Americans with electoral opportunity in rough proportion to their share of the population. When presented with several redistricting plans that provide roughly proportional electoral opportunity, the Court is not required to determine which one is the most fair. In other words, the Court need not reject one roughly proportional plan because there exists another which may be slightly more roughly proportional.

42

In any case, Plaintiffs do not seek "roughly proportional" electoral opportunity. Rather, they want to maximize African-American electoral opportunity. According to the City Council's minutes, Councilwoman Delgado[12] stated at the June 21, 2012, redistricting summit that she was "interested in ways of maximizing minority voting power because of the history of voting in this community and in Mississippi." At trial, she admitted that her primary goal was to create a third majority-black district. Likewise, representatives of the CPAC group – at least one of whom is a Plaintiff in this case – made it clear in the public hearings that their only concern was creating a third majority-black district. In other words, Plaintiffs believe that "anything short of the maximum number of majority-minority districts consistent with the *Gingles* conditions would violate § 2 . . . ." *De Grandy*, 512 U.S. at 1016. But "reading § 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose. One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Id.* at 1016-17.

## I.   *Summary*

In summary, the Court resolves each of the "totality of the circumstances" factors[13] as follows:

---

[12]Although Councilwoman Delgado is not one of the Plaintiffs, it was apparent from her testimony at trial and her participation in the public hearings on the proposed redistricting plans that she identifies with and supports Plaintiffs' position in this case.

[13]*See LULAC*, 548 U.S. at 426; *Fairley*, 584 F.3d at 672-73.

Case 2:13-cv-00018-KS-MTP   Document 83   Filed 08/11/15   Page 44 of 46

1.   Hattiesburg has a history of official racial discrimination, but all such practices ceased many years ago. This factor weighs slightly in favor of Plaintiffs.

2.   Voting is highly polarized along racial lines in Hattiesburg. Blacks most often vote for blacks, and whites most often vote for whites. This factor weighs in favor of Plaintiffs.

3.   There is no evidence that the majority-vote requirement hinders African-American electoral opportunity. This factor weighs in favor of Defendants.

4.   Although there exists a substantial socioeconomic disparity between Hattiesburg's African-American citizens and its white ones, it does not hinder African-Americans' voting and participation in the City's political process. This factor weighs in favor of Defendants.

5.   There is no evidence of racial appeals in Hattiesburg's city elections. This factor weighs in favor of Defendants.

6.   No African-American has ever been elected to the City Council from Wards 1, 3, or 4. However, Hattiesburg's African-American mayor has enjoyed substantial electoral success, and he wields a considerable amount of power in the mayor-council form of municipal government. This factor weighs slightly in favor of Plaintiffs.

7.   The evidence overwhelmingly demonstrates that Hattiesburg's elected officials, including its white City Council members, are responsive to the needs of the African-American community. This factor weighs in favor of Defendants.

8.   The Council Plan furthers the City's legitimate, non-tenuous interests. This factor weighs in favor of Defendants.

9.   The number of districts in which African-Americans form an effective majority is roughly proportional to their share of the City's population, particularly when one considers voting-age population. This factor weighs in favor of Defendants.

Therefore, six of the nine factors weigh in favor of Defendants, but the two most

important factors – racial polarization and the extent of African-American electoral success[14] – weigh in favor of Plaintiffs.

As noted above, a municipality violates Section 2 where, "based on the totality of the circumstances, it is shown that the political processes leading to . . . election in the . . . political subdivision are not equally open to participation by members of [a racial group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representative." *Gingles*, 478 U.S. at 47. The parties need not prove any particular number of factors. *Id.* at 45. "Rather, . . . the question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Id.* (punctuation omitted).

Plaintiffs would have the Court reduce the Section 2 analysis to a crude quota system, in which majority districts are rigidly apportioned on the basis of racial proportions in the population. The law requires a more searching, thorough analysis. After spending a great deal of time considering the evidence, the Court concludes that Hattiesburg's current ward plan does not practically hinder African-Americans'

---

[14]*Gingles*, 478 U.S. at 51 n. 15.

45

opportunity to participate in the political process and elect representatives of their choice. The evidence demonstrates that African-Americans in Hattiesburg enjoy political power in rough proportion to their share of the voting-age population, and that they actively exercise such power through the political process.

## V. CONCLUSION

For these reasons, the Court finds that Hattiesburg, Mississippi's current ward plan does not dilute the voting or political power of African-American citizens in violation of Section 2 of the Voting Rights Act. The Court will enter a separate Final Judgment consistent with this opinion.

SO ORDERED this the 11th day of August, 2015.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE

46